# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| KIMBERLY A. RIPOLI,<br>        Plaintiff,<br><br>    v.<br><br>STATE OF RHODE ISLAND,<br>DEPARTMENT OF HUMAN<br>SERVICES, OFFICE OF VETERANS<br>AFFAIRS,<br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 1:17-cv-225-JJM-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Kimberly A. Ripoli has alleged discrimination under Title VII based on sexual orientation, gender, and disability during her employment with the State of Rhode Island, Department of Human Services, Office of Veterans Affairs ("State").[1]  She also alleges violations of the Rhode Island Civil Rights of People with Disabilities Act ("CRPDA"), the Rhode Island Fair Employment Practices Act ("FEPA"), and the Rhode Island Civil Rights Act of 1990 ("RICRA").  ECF No. 1.  Following an extended period of discovery, the State moved for summary judgment.  ECF No. 79.  For the following reasons, the Court GRANTS the State's Motion for Summary Judgment on all claims.

---

[1] Ms. Ripoli originally also alleged age discrimination, but later withdrew that allegation.

## I.    STANDARD OF REVIEW

Under Rule 56, a party may move for summary judgment if the movant can show that there is "no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Summary judgment is a "drastic remedy" because it deprives the parties of the right to a jury trial under the Seventh Amendment.  *Colman v. Faucher*, 128 F. Supp. 3d 487, 490 (D.R.I. 2015).  As such, all factual disputes are viewed in the light most favorable to the nonmoving party.  *Id.*  The purpose is to "secure the just, speedy, and inexpensive determination of every action" by resolving claims that have no factual basis.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).  A dispute is genuine if "a reasonable jury could resolve the point in favor of the nonmoving party."  *Staples v. Gerry*, 923 F.3d 7, 12-13 (1st Cir. 2019) (citing *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009)) (quotations omitted).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court will not consider factual disputes that are irrelevant or unrelated to the substantive law at issue in the case.  *Id.*

## II.    BACKGROUND

Ms. Ripoli was laid off from her position as Associate Director of the Office of Veterans Affairs ("OVA") on July 27, 2016, a position she had held for four years.  In her position as Associate Director, she served under the Department of Human Services Director and oversaw the Rhode Island Veterans' Home, the Veterans' Memorial Cemetery, and the Office of Veterans' Affairs.  She managed a small

executive team and oversaw a staff of 260 state employees.  ECF No. 111 at 9.  By all accounts, Ms. Ripoli performed well in this role.  ECF No. 91-1 at 13 (Pl.'s Ex. 16) (she was "[p]assionate, determined. . . [cared] about our veterans and military families"); ECF No. 89-1 at 10 (Pl.'s Ex. 2) ("she was good at her job . . . a great employee").  She carried out these responsibilities through February 2016, when Governor Raimondo appointed Kasim Yarn as the Director of Veterans Affairs.[2]

Mr. Yarn took over management of the OVA shortly after he was appointed. ECF No. 81-1 at 22 (Def.'s Ex. D).  He began networking and attending events as the public face of the OVA, instructed staff to set up and equip a new office, solicited input from the executive team, and conducted a wide-ranging needs assessment.  *Id.* at 26-52 (Def.'s Ex. E); ECF No. 81-3 at 21-24 (Def.'s Ex. M).  He also started a reorganization of the leadership team, implemented a flat reporting structure, and proposed eliminating Ms. Ripoli's position, citing overlap with the Director's role. ECF No. 81-4 at 27 (Def.'s Ex. W).  This process was formally initiated on June 21, 2016, in an email to senior leadership.  *Id.*  Shortly thereafter, Mr. Yarn proposed adding the position of Administrator for Strategic Communications, Policy & Legal Services.[3]  The description for this role was drafted by MJ, a male colleague of Ms. Ripoli, who was eventually promoted into this position.  ECF No. 91-1 at 30-33, 41-

---

[2] Previously the OVA had no permanent director, and the position had been vacant since it was created in 2011.  ECF No. 79-1 at 4.

[3] As part of the reorganization, Mr. Yarn proposed adding two caseworker positions and a new position for an Implementation Aide.  *Id.* at 32.  The position of Administrator for Strategic Communications, Policy & Legal Services was not part of the proposal that was made to senior leadership on June 21.

43 (Pl.'s Ex. 16).  Less than a month later, Ms. Ripoli reached out to Human Resources to complain that "no one reported to her anymore [and] that all her subordinates were taken away."  She stated that she felt "harassed" by Director Yarn, that she had been working in a hostile work environment, that as the only woman in leadership (and a combat-disabled veteran) her position was being minimized, and that Mr. Yarn had empowered her colleagues to be rude and hostile to her.  ECF No. 81-7 at 9-13 (Def.'s Exs. SS, TT).  These allegations were investigated by Human Resources, which found them to be meritless.  ECF No. 81-7 at 15 (Def.'s Ex. UU); ECF No. 81-5 at 23-25 (Def.'s Ex. II).

Ms. Ripoli argues that the reorganization was pretextual and that new positions were created or maintained to shuffle around underperforming men in the organization.  She also alleges that she was mistreated by Mr. Yarn based on her gender, disability, and sexual orientation.  At the time the reorganization was initiated (June 21, 2016), the proposed structure of the executive team included one supervisor (Mr. Yarn, a man), six positions in parallel leadership roles (held by MJ, RB, JR, all men, with three vacant positions), and one subordinate leadership role (held by BC, a man).[4]  ECF No. 81-4 at 32 (Def.'s Ex. W).  Ms. Ripoli's position was eliminated shortly thereafter.  She filed a complaint with the Rhode Island

---

[4] Elsewhere, Mr. Yarn indicated his executive team consisted of Ms. Ripoli (a woman), LL (a woman), RB, JR, MJ, and BC (all men).  ECF No. 81-3 at 21-22 (Def.'s Ex. M).  The charts attached to the June 21 email do not list LL on the leadership team but suggest that she held a subordinate role within the Rhode Island Veterans' Home.  ECF No. 81-4 at 29, 32 (Def.'s Ex. W).

Commission for Human Rights ("RICHR") and the Equal Employment Opportunity Commission ("EEOC") and was issued a notice of right to sue. ECF No. 1.

## III. DISCUSSION

Ms. Ripoli is female, a lesbian, and a disabled combat veteran. At the time of her layoff, she was an at-will employee and did not have protected status. She alleges discrimination under Title VII based on gender, disability, and sexual orientation, as well as violations of FEPA, RICRA, and the CRPDA. ECF No. 1. Her primary claim is a disparate treatment claim under Title VII. She also alleged harassment and retaliation in her RICHR complaint, so we will briefly discuss these claims as well.[5]

### A. Retaliation

To make a prima facie case for retaliation, a plaintiff must show that (1) they engaged in protected conduct (here, speaking to Human Resources); (2) they suffered an adverse employment action (here, Ms. Ripoli was laid off); and (3) there is a causal nexus between the protected activity and the adverse action. *Carvalho v. Santander Bank, N.A.*, 573 F. Supp. 3d 632, 645 (D.R.I. 2021) (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 24 (1st Cir. 2013)). The Supreme Court has held that this is a "but-for" test. *Carvalho*, 573 F. Supp. 3d at 645 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

---

[5] Rhode Island courts follow Title VII when analyzing disparate treatment, harassment, and retaliation under FEPA and RICRA. *See DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 21, 23 (R.I. 2005); *Newport Shipyard, Inc. v. Rhode Island Comm'n for Hum. Rts.*, 484 A.2d 893, 898 (R.I. 1984); *Shoucair v. Brown Univ.*, 917 A.2d 418, 426-27 (R.I. 2007). As such, these state claims rise and fall with the Title VII claim.

U.S. 338, 362 (2013) ("a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action")).

Ms. Ripoli cannot meet this standard.  The record shows that Mr. Yarn took formal steps to eliminate her position in late June.  ECF No. 81-4 at 27 (Def.'s Ex. W).  Ms. Ripoli first complained of harassment fifteen days *after* Mr. Yarn sent this email.  ECF No. 81-7 at 9 (Def.'s Ex. SS).  Although the layoff took place after her complaint (*see* ECF No. 81-4 at 38), the email initiating her layoff predated it.  As such, Ms. Ripoli cannot show a causal nexus—let alone "but-for" causation—that is required to sustain a retaliation claim under Title VII.

### B.    Hostile Work Environment

To sustain a claim for hostile work environment, a plaintiff must show that (1) they are a member of a protected class; (2) who was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment; (5) the employer's conduct was both objectively and subjectively offensive, such that "a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so"; and (6) a basis has been established for employer liability.  *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001) (citation omitted).  Specifically, they must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (citations and quotation marks omitted).  "[M]ere offensive utterance[s]"

typically do not constitute a hostile work environment for the purposes of a Title VII claim. *Harris*, 510 U.S. at 23.

Ms. Ripoli cannot meet this standard because she has not identified any intimidating, insulting, or derogatory conduct that is "severe or pervasive" in nature. She has only identified two instances in which anyone discussed her sexual orientation, and none in which her gender or disability were at issue.[6]  There is no indication that Mr. Yarn ever asked about Ms. Ripoli's sexual orientation, gender, or disability, let alone made derogatory comments or treated her in a disrespectful manner.  Ms. Ripoli notes that Mr. Yarn often used terms of endearment with male colleagues, referring to MJ as "warfighter" and "Hard Charger."  ECF No. 89-2 at 41-53 (Pl.'s Ex. 3).  However, the record indicates that he used similar terms to refer to her, calling her "Senior" as a term of respect.  ECF No. 108-1 at 71 (Def.'s Ex. JJJ). A reasonable jury could not find, based on these facts, that Mr. Yarn facilitated a hostile work environment or engaged in harassment under Title VII.

### C.    Disparate Treatment

Ms. Ripoli's primary argument under Title VII alleges disparate treatment: to wit, that men were given "sweetheart deals," and she wasn't.  Her claim rests on

---

[6] The first instance occurred in 2013, when a subordinate (who was subsequently disciplined) called her a "fucking dyke." ECF No. 111 at 28.  The second occurred in 2015, when a colleague went out of his way to notify Ms. Ripoli's supervisor that she was a lesbian because he wanted her to be "aware of the situation." *Id.* at 29; ECF No. 96 at 9-10 (Pl.'s Ex. 11).  These are isolated incidents that occurred years before the adverse action and did not involve a supervisor and thus have little bearing on this case.

circumstantial evidence, and so the Court will apply the *McDonnell Douglas* burden-shifting analysis. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).

Under *McDonnell Douglas*, the plaintiff bears the burden to show a prima facie case of discrimination by showing that (1) they are a member of a protected class; (2) they were qualified for the position; (3) they suffered an adverse employment action; and (4) someone with comparable or inferior qualifications was hired or retained. *Id.* at 496; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff has established an inference of discrimination, the burden of production shifts to the defendant to show that there is a legitimate, nondiscriminatory reason for the action. *Ahmed*, 752 F.3d at 496. If the defendant can articulate a reason, the inference disappears, and the burden shifts back to the plaintiff to show "by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason . . . is discriminatory." *Id.* (citation omitted). Pretext requires a two-part showing: first, that the articulated reason is pretextual, and second, that the true reason is discriminatory. *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012) (internal citations omitted).

### a.    Prima Facie Case

As the First Circuit noted in *Alvarado-Santos v. Department of Health of the Commonwealth of Puerto Rico*, the prima facie showing may vary based on the plaintiff's claim. 619 F.3d 126, 132 (1st Cir. 2010), *cert. denied*, 565 U.S. 827 (2011) (citation omitted). When a person is laid off and someone else is hired in their place, a plaintiff must show that (1) they are a member of a protected class; (2) they were

qualified for the position; (3) they suffered an adverse employment action; and (4) the position remained open or was filled by a person with similar qualifications. *Kosereis*, 331 F.3d at 212-13. Alternatively, where there is a reduction in force, the fourth prong may be satisfied by showing that "the employer did not treat [the protected characteristic] neutrally or that younger persons were retained for the same position." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018 (1994) (citation omitted) (applied in the context of age discrimination).

The parties dispute which standard should be used in this case. The State argues that because the job was eliminated, no job remained open, and no one could possibly have filled it. ECF No. 79-1 at 40 ("It is undisputed that OVA has not hired another Associate Director").[7] Ms. Ripoli argues that the position *did* remain open because she and MJ (formerly her subordinate) were competing for an emergent "chief of staff" position which, she argues, he was eventually promoted into. ECF No. 94-1 at 30-32. Alternatively, she argues that this is a reduction in force case, that the position was eliminated, and that "the state did not treat [disability, gender, or sexual orientation] neutrally" by giving male employees "sweetheart deals" and finding them alternative positions in state government. *Id.*

For the sake of argument and viewing the facts in the light most favorable to the plaintiff, we assume without deciding that Ms. Ripoli has established a prima

---

[7] To this end, the State relies on this Court's prior reasoning indicating that where an employer has laid someone off and redistributed their job duties, the employee cannot meet their prima facie burden. *Caruso v. Central Falls Detention Facility Corp.*, No. 16-596-JJM-PAS, 2019 WL 2929763 at *2 (D.R.I. July 8, 2019).

facie case on all claims. This case involves the ongoing reorganization of leadership positions on a small executive team. As such, the question of whether there has been a "reduction" or "replacement" (as Ms. Ripoli would have it) or simply a "redistribution of responsibilities" (as the State argues) is, of necessity, a disputed question of fact.

It is a dispute, moreover, that goes to the sufficiency of comparators. The First Circuit says clearly that the place to evaluate comparators is in the third step of the *McDonnell Douglas* analysis, not the first. *See Kosereis*, 331 F.3d at 213 (citing *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999) ("[T]he time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual.")). Prior cases notwithstanding, we are mindful of the Supreme Court's guidance that the burden for a prima facie case is not "onerous." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). As such, we assume without deciding that Ms. Ripoli has met her initial burden on all claims.

### b.    Legitimate Nondiscriminatory Reason

The burden thus shifts to the State to articulate a legitimate nondiscriminatory reason for the challenged conduct. *Id.* at 254. The State argues that Ms. Ripoli was laid off as part of a broader reorganization, with the goal of "[f]lattening the organizational reporting structure, developing a robust website, establishing a centralized and easily [accessible] office for veterans, eliminating a position that duplicated many of the Director's [roles] and responsibilities, filling caseworker positions that directly assist veterans, [and] retooling official state job

titles and duties." ECF No. 79-1 at 1. As to the specific reason given for the layoff, Mr. Yarn stated the following in his email:

> Lean Improvement. Veteran satisfaction is considered the central focus in the Lean approach. With a staff the size of R.I. Veterans Affairs, the office must take a Lean approach—realign to be more efficient and effective. The Associate Director position job requirements/description are the same as the Director's Position. This redundancy has adverse effects on the overall budget and productivity. I have assessed [both] the Veterans Home and Cemetery Administrator positions, and they both have the characteristics needed to work directly with the Director, while functioning efficiently and effectively.[8]

ECF No. 81-4 at 27 (Def.'s Ex. W).

This is a legitimate nondiscriminatory reason. As the Supreme Court has held, the defendant need only articulate a lawful reason; they do not have to prove it by a preponderance of the evidence at this stage of the analysis. *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 256-57. The State has done so here.

### c.    Pretext

As such, the burden shifts back to Ms. Ripoli to show pretext. This inquiry is the crux of the dispute. To do so, she must show that there is a genuine dispute over whether (1) the articulated reason is pretextual (i.e., a fabrication, not the real reason) and (2) the true reason is discriminatory. *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000) (citing *Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir. 1995)); *see also Ryder v. Pearson Educ., Inc.*, 486 F. Supp. 3d 489, 505 (D.R.I. 2020). She need not offer direct evidence or any kind of

---

[8] At least initially, there was a brief dispute over whether budgetary restrictions would play a role in the layoff. The issue was not resolved but the layoff moved forward regardless, suggesting that this was not the dispositive issue. ECF No. 81-6 at 18-19 (Def.'s Ex. NN).

"smoking gun" (a discriminatory statement or comment, for instance). *Thomas*, 183 F.3d at 58, 64. However, she must still produce sufficient evidence to establish a genuine dispute over whether the action was both pretextual and discriminatory. *Id.*; *see also Theidon v. Harvard Univ.*, 948 F.3d 477, 497 (1st Cir. 2020) (plaintiff must offer "some <u>minimally sufficient</u> evidence, direct or indirect, of both pretext and of . . . discriminatory animus") (citation omitted). The focus is on whether the decisionmaker (the employer) believed their stated reason to be credible. *Theidon*, 948 F.3d at 497 (citation omitted).[9] It is not enough to simply "impugn the veracity of the employer's justification"; the plaintiff must "elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Id.* (citation omitted).

There is "no mechanical formula" for pretext and "a case-by-case analysis is always necessary." *Thomas*, 183 F.3d at 57-58 ("There can be no rigid requirement that plaintiffs introduce a separate 'plus' factor, such as a negative employer comment about a plaintiff's protected class"). Comparator evidence is a key part of

---

[9] As many courts have noted, a layoff may be pretextual but not discriminatory. *See Barry v. Moran*, 661 F.3d 696, 708 (1st Cir. 2011) (holding that employment decisions motivated by cronyism, friendship, and nepotism are "lawful, though perhaps unsavory" and that "employers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory") (citations omitted). Nor is it the Court's job to determine whether an employer erred in deciding to lay off an employee. *Keyes v. Sec'y of the Navy*, 853 F.2d 1016, 1026 (1st Cir. 1988) ("Errors in judgment are not the stuff of Title VII transgressions—so long as the 'mistakes' are not a coverup for invidious discrimination") (citation omitted). Slapdash decision-making may be deeply problematic, but it is not covered under Title VII.

the analysis. *McDonnell Douglas Corp.*, 411 U.S. at 804 ("[e]specially relevant . . . would be evidence that white employees [engaged in similar conduct] were nevertheless retained or rehired"). The factfinder is also entitled to consider "the [employer's] treatment of [the employee] during his prior term of employment" and "the [employer's] general policy and practice" with respect to the employment of people in protected classes. *Id.* at 804-5. Finally, the factfinder is permitted to consider "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated reasons. *Theidon*, 948 F.3d at 497 (citation omitted). Evidence of mendacity or deception strongly supports an inference of discriminatory pretext and may be enough to get a plaintiff past summary judgment or even sustain a jury verdict based on pretext alone, provided the plaintiff has established a prima facie case. *See, e.g.*, *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1092 (1st Cir. 1995); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). However, the plaintiff still bears the ultimate burden to prove that the stated reason is both pretextual and motivated by discriminatory animus. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518 (1993).[10]

---

[10] The Supreme Court in *Hicks* was at pains to note that the purported two-part test in *Burdine*—that the employee may show intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"—is dicta and does not alter the burden of persuasion, which always remains with the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 517-18 (citing *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 256). A plaintiff may be able to get to a jury, in other words, by showing that the stated reason is "unworthy of credence," but can only win on the merits if they are able to prove that the underlying motive was discriminatory.

The Court's role at summary judgment is a limited one: it is the Court's job to determine whether there is a genuine dispute over both prongs. We may not "consider the credibility of witnesses, resolve the conflicts in testimony, or evaluate the weight of the evidence." *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 26 (1st Cir. 1998) (citation omitted). We may only evaluate whether Ms. Ripoli has shown any evidence to support an inference that the nondiscriminatory stated reason: (1) was untruthful; and (2) was motivated to cover discriminatory animus, and if so, to determine whether that evidence is admissible. We acknowledge that this analysis is messy and fact-intensive, with many invitations for the Court to weigh in on credibility determinations that properly belong to the jury. *See Theidon*, 948 F.3d at 496 ("We proceed with caution and restraint when considering summary judgment motions where . . . issues of motive and intent must be resolved."). Even so, we recognize that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (internal citations and quotations omitted).

We start by evaluating Ms. Ripoli's comparator evidence, looking at whether she has provided admissible evidence that "similarly situated employees were not treated equally." *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 258. Second, we explore whether there are other supporting facts by which a reasonable jury could find that her layoff was "more likely motivated" by discriminatory animus. *Id.* at 256. Third, we consider whether a reasonable jury could find that Mr. Yarn's stated reason was

"unworthy of credence," and if so, whether the record is sufficient to advance the case to a jury on pretext. *Id.* Taking the facts in the light most favorable to the nonmoving party, we start with pretext, then move to whether there is a genuine dispute over discriminatory animus.

### i. Evidence of Pretext: Comparators

Comparator evidence is a key part of proving disparate treatment under Title VII. *McDonnell Douglas Corp.*, 411 U.S. at 804. Here, Ms. Ripoli argues that straight, nondisabled men were given "sweetheart deals" rather than be laid off after allegations of misconduct. ECF No. 94-1 at 4-6. She points to two men (DK and DE) who were moved to lower-paying positions in 2007 and 2008, and two men (JR and MJ) who were promoted or transferred between 2016 and 2018. *Id.* at 4-6, 21-28.[11] The State argues that these men are not comparators because they worked at different jobs, with different titles, at lower pay grades. ECF No. 79-1 at 43-48. The State further argues that the transfers in 2007 and 2008 are too remote to be legally

---

[11] It is undisputed that these four men held shifting positions within the OVA. *See* ECF No. 81-4 at 19-22 (Def.'s Ex. U). DE held the position of Associate Director, but was moved into the role of Chief, Family Health Systems, a lower-paying job, in 2008. MJ held this role until 2018, when he was promoted to the position of Strategic Planning, Policy & Communications Administrator, a new position that had been created shortly after Ms. Ripoli's layoff in 2016. *Id.* DK held the position of Administrator of the Rhode Island Veterans' Home until 2007, when he moved into the lower-paying job of Assistant Administrator in 2007. JR held this role until March 2016, when he was promoted to Interdepartmental Project Manager and later moved to another department. *Id.* Ms. Ripoli argues that the position of Chief, Family Health Systems was a placeholder job, and that the State had a practice of maintaining open positions to move people around in lieu of firing them.

valid comparators.  *Id.*  Finally, the State argues that Ms. Ripoli's misconduct claims are based on inadmissible hearsay.  ECF No. 108 at 1-5.

A disparate treatment claim relying on comparator evidence must show that the proposed comparator is "similarly situated in material respects."  *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996).

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared with apples.

*Diaz v. City of Somerville*, 59 F.4th 24, 32 (1st Cir. 2023) (citing *Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989) (overruled on other grounds)). "Reasonableness is the touchstone: . . . [they] need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances." *Conward*, 171 F.3d at 20.

While there is no exhaustive list of factors, a plaintiff must generally show that they "dealt with the same supervisor, [were] subject to the same standards[, and] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct."  *Sellers v. U.S. Dep't of Def.*, 654 F. Supp. 2d 61, 67 (D.R.I. 2009) (granting summary judgment where employees reported to different supervisors and there was no evidence of a company-wide policy) (citations and quotations omitted); *see also Rodríguez–Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir. 1999) (comparators are not similarly situated where they involve evaluations by different supervisors, cover different periods of time, and

are related to different stores). Alternatively, an employee may be able to show disparate treatment if there is evidence of a company-wide policy. *See, e.g., Petsch-Schmid v. Bos. Edison Co.*, 914 F. Supp. 697, 705 n. 17 (D. Mass. 1996). A plaintiff may be similarly situated to other employees in one respect but not others, thus precluding an "apples to apples" comparison. *See González-Bermúdez v. Abbott Lab'ys P.R. Inc.*, 990 F.3d 37, 44 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 389 (2021) (holding that comparators were not similarly situated where, following a reorganization, they occupied lower positions, performed different duties, and reported to different supervisors).

The State argues that job title alone should be determinative, citing a line of cases in which employees were not found to be similarly situated because they had distinct titles or roles. *See García v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 32 (1st Cir. 2008); *Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas*, 982 F.3d 20, 29 (1st Cir. 2020); *Woodward v. Emulex Corp.*, 714 F.3d 632, 639 (1st Cir. 2013); and *Danna v. Rhode Island Sch. of Design*, No. 21-188-JJM-PAS, 2022 WL 1538881, at *4 (D.R.I. May 16, 2022). We do not agree that the title alone is determinative, for three reasons. First, unlike the precedent cases, this case involves a small executive team in which all parties occupied unique leadership positions, with distinct management responsibilities over different parts of the organization. Second, the parties have put forward admissible evidence that employees at the OVA were working out of job title, making it difficult to rely on title alone to establish

comparators.[12]  Third, the record indicates that the OVA was in a state of flux during this period.  It is undisputed that before February 2016, Ms. Ripoli occupied a senior role, and thus MJ and JR would not be appropriate comparators.  However, Mr. Yarn took over management of the department in February 2016.  ECF No. 81-1 at 22 (Def.'s Ex. D).  Although the "flattening" was not formally initiated until four months later, the evidence suggests that some aspects of her role had begun to change between February and July.  *See, e.g.*, ECF No. 81-2 at 71-86 (Def.'s Ex. H).  A reasonable jury could find that by July, she was more a colleague than a superior.

Taking these facts in the light most favorable to the plaintiff, we hold that a "prudent person" would not establish comparators based on job title alone, but would consider (1) whether the parties had the same supervisor, and (2) whether that supervisor exercised decision-making power over the employee's change in job title (whether a layoff, a promotion, or a job transfer).[13]  *See Sellers*, 654 F. Supp. 2d at 67 ("Employees are generally not similarly situated if they are subject to the decisions of different supervisors.").  We decline to consider job transfers that are remote in time, because Ms. Ripoli stated at the outset that the relevant period is the five-month period between when Mr. Yarn was hired and when Ms. Ripoli was laid off.

---

[12] MJ's title was Chief, Family Health Systems, for instance, but he was acting as a legislative liaison.  ECF No. 108-1 at 41 (Def.'s Ex. GGG).  JR's title was Assistant Administrator, but he was working as an Interdepartmental Project Manager.  ECF No. 108 at 26.

[13] Ms. Ripoli has not alleged facts that would support a systemic practice, so we construe comparators strictly in terms of supervisory authority.

ECF No. 1 at 5-6.  As such, only people on Mr. Yarn's executive team at the time of her layoff would be appropriate comparators.

DE and DK are not appropriate comparators because their transfers occurred eight and nine years before this incident and were authorized by different supervisors.  JR is also not an appropriate comparator because while he was on the executive team and working under Mr. Yarn at the time that Ms. Ripoli was laid off, his transfer was authorized by Melba Depeña, the Director of the Department of Human Services.  The State points to other high-ranking officials who were laid off following departmental reorganizations as proposed comparators to show lack of discrimination; none of these are appropriate comparators because they all served under different supervisors.  ECF No. 79-1 at 42.  The only appropriate comparator is MJ, who (like Ms. Ripoli) was working directly under Mr. Yarn at the time of Ms. Ripoli's layoff, and whose subsequent transfer (like Ms. Ripoli's) was effectuated by Mr. Yarn.[14]  MJ does not share any of Ms. Ripoli's protected characteristics, and unlike her, he was able to keep his job.

A final note on comparators: as part of the proposed reorganization, Mr. Yarn attached a chart outlining the new "flattened" structure.  ECF No. 81-4 at 32 (Def.'s Ex. W).  The chart is quite simple: it proposes an executive team with Mr. Yarn at the top, and with JR, MJ, and RB (all men) reporting directly to him.  BC's subordinate position is also listed on the chart, as well as three vacant roles for the

---

[14] Although MJ was not promoted to the role of Strategic Planning, Policy & Communications Administrator until 2018, the record indicates that Mr. Yarn began the process of creating this position in July 2016.

new positions.[15]  In other words, at the time that Ms. Ripoli was laid off, there were five men on the executive team and three vacant positions.  Looking objectively at this chart, it is reasonable to compare Ms. Ripoli's situation to other colleagues (here, all men) who worked under Mr. Yarn and whose transfers were carried out by him, differences in pay and title notwithstanding.  Even given this generous view, the only plausible comparator is MJ.

### ii.  Evidence of Pretext:  General Policy and Practice

A plaintiff may also show pretext by pointing to "facts as to the [employer's] treatment of [the employee]" as well as the employer's "general policy and practice" with respect to protected classes.  *McDonnell Douglas Corp.*, 411 U.S. at 804-5.  Ms. Ripoli has alleged many facts to argue that she was unfairly treated by Mr. Yarn, but none that suggest a pervasive culture of disrespect.  She argues that she was left out of meetings and emails, but the record shows that she was often included.  ECF No. 81-2 at 71-86 (Def.'s Ex. H).  She argues that Mr. Yarn regularly referred to MJ using names like "warfighter" and "Hard Charger," but the record shows that he used similar terms to refer to her, calling her "Senior" as a form of respect.  ECF No. 108-1 at 71 (Def.'s Ex. JJJ).  She argues that Human Resources failed to investigate her claim, but the record shows that they did.  ECF No. 81-7 at 15 (Def.'s Ex. UU).  There is evidence to suggest that Ms. Ripoli did not have a phone line in the new office, but

---

[15] Elsewhere, Mr. Yarn identified LL (a woman) as part of his executive team, but she was not listed on the chart that was submitted to senior leadership proposing a reorganization of the team, and her position appears to be subordinate to BC (a man).  ECF No. 81-4 at 29 (Def.'s Ex. W).

this alone is not enough to show pretext. By all accounts, she was treated respectfully and admired by her colleagues and by Mr. Yarn, who treated her as a valued member of the team.

Likewise, Ms. Ripoli has provided no evidence to suggest a policy or practice of giving jobs to nondisabled straight men. She argues passionately, based on comparators, that the State had a broader policy of giving men "sweetheart deals." But this is speculative, and she has provided no evidence to support it beyond her own anecdotal experience. Nor has she put forward evidence to show that women, LGBTQ+ folks, or disabled employees were systematically kept out of leadership positions. In *Colman v. Faucher*, for instance, this Court held that an employer's demonstrated failure to interview any women over a four-year period was sufficient to raise a genuine dispute over pretext, because it suggested a "pattern of disinterest" in female candidates. 128 F. Supp. 3d at 495-96. No similar evidence has been put forward here, even though Ms. Ripoli—as the former Associate Director of OVA— presumably would have been aware if women were systematically being kept out of leadership positions.

### iii. Evidence of Pretext: Mendacity

Ms. Ripoli's argument does not rely on direct evidence, or even affirmative circumstantial evidence, but on the more challenging ground of establishing that the employer's stated reason was a lie. *See Tex. Dep't of Cmty. Affs.*, 450 U.S. at 256 (an employee can show intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly

by showing that the employer's proffered explanation is unworthy of credence"). As noted above, a plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's given reason. *Theidon*, 948 F.3d at 497. Evidence of mendacity or deception strongly supports an inference of pretext. *Woodman*, 51 F.3d at 1092. If a plaintiff can successfully rebut the employer's reason and show that it was a lie, they may be able to win on the merits without needing to provide any additional evidence beyond their prima facie case. *Id.*

There is an open question about whether the issue of discrimination may go to a jury on pretext alone, in the absence of any other supportive facts of discriminatory intent. In *St. Mary's Honor Center v. Hicks*, the Supreme Court held that once the plaintiff has made a prima facie case, a successful rebuttal of the employer's stated reason "will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" without the need for additional proof, but that it does not compel judgment for the plaintiff. 509 U.S. at 510-11. Likewise, in *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court held that where mendacity is at issue, a plaintiff who has made a prima facie case can show discrimination based on the lie alone, without needing to put forward additional evidence of intentional discrimination. 530 U.S. at 147. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of

intentional discrimination, and it may be quite persuasive."[16]  *Id.*  Justice Ginsburg's concurrence in *Reeves* suggests that where pretext is shown, the issue should go to a jury:

> As the Court notes, it is a principle of evidence law that the jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability.  *Ante*, at 2108.  Under this commonsense principle, evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation.  *Ibid.*  Whether the defendant was in fact motivated by discrimination is of course for the finder of fact to decide . . . But the inference remains—unless it is conclusively demonstrated, by evidence the district court is required to credit on a motion for judgment as a matter of law, see *ante*, at 2110-2111, that discrimination could not have been the defendant's true motivation.  If such conclusive demonstrations are (as I suspect) atypical, it follows that the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced [evidence supporting pretext and a prima facie case].

*Reeves*, 530 U.S. at 154-55 (Ginsburg, J., concurring).

These cases have formed the basis of First Circuit decisions where the plaintiff has been able to preserve a jury verdict or withstand summary judgment based on pretext alone, on the premise that it is the *factfinder's* role (not the Court's) to determine whether the lie renders the motive discriminatory.  *See Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 29 (1st Cir. 2019), *cert. denied*, 140 S.Ct. 455

---

[16] *Hicks* and *Reeves* reach the same conclusion from opposite angles.  In *Hicks*, the trial court—acting as factfinder—held that the plaintiff had showed pretext, but not discrimination (thus holding for the employer).  The 8th Circuit reversed under an older interpretation of *Burdine* suggesting that pretext alone was enough.  509 U.S. at 508.  In *Reeves*, a jury held that the lie was enough to show both pretext *and* discrimination (thus holding for the plaintiff) but was reversed by the 5th Circuit, which held that further evidence of discrimination was required.  530 U.S. at 140, 153-54.  In both cases, the Supreme Court reversed on the grounds that the court had improperly taken the issue away from the factfinder.

(2019) (a court should only enter judgment as a matter of law for the defendant if there is sufficient evidence "to <u>conclusively</u> demonstrate that [the employer's] actions were not discriminatorily motivated") (emphasis in original) (citing *Reeves*, 530 U.S. at 153); *Woodman*, 51 F.3d at 1094-95 (vacating summary judgment when the plaintiff put forward admissible evidence that the employer's stated reasons were a lie). The issue is not whether Ms. Ripoli ultimately bears the burden of proving both pretext and discrimination, but whether pretext alone is enough to get her to a jury.

At the same time, it is the Court's responsibility to separate cases in which there is a disputed issue of fact from those in which "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. The Supreme Court has held that where the record conclusively reveals a legitimate, nondiscriminatory reason for the employer's decision, or where the plaintiff has created only a weak issue as to pretext and there is abundant evidence that no discrimination occurred, a court is permitted to find for the defendant as a matter of law. *Id.* ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). The First Circuit reminds us, furthermore, that it is our job to distinguish minimally sufficient facts from "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Theidon*, 948 F.3d at 494 (citation omitted). At summary judgment, Ms. Ripoli has the burden to show a

genuine dispute over both pretext and discrimination.  If she does so, the case will go to a jury.

To support her claim that the stated reason was a pretext, Ms. Ripoli makes three arguments.  First, she argues that the Assistant Director role was not "redundant," pointing to the job description, which indicates that the role of the Assistant Director is to "assist" the Director.  ECF No. 94-1 at 35-36 ("A jury can find that Mr. Yarn's simplistic justification for firing Ms. Ripoli, that her position was the same as his, was simply false.").  She argues that if Mr. Yarn had done a true "Lean"[17] analysis, as he purported to in his email, he would have realized that the positions were not duplicative.  *Id.* at 36-37.  Second, she points to the fact that the email did not mention the creation of a new position of Administrator for Strategic Communications, Policy & Legal Services, suggesting that reference to this position was intentionally omitted to hide the fact that Mr. Yarn intended to elevate MJ, a nondisabled straight man, into the role.  *Id.* at 38-39 ("A jury can also conclude that Mr. Yarn kept the creation of [MJ's] new job out of his proposal to eliminate Ms. Ripoli's job because he knew it would draw human resources scrutiny that it could not withstand.").  Third, she argues that she was qualified for the position, and that the only conceivable reason he could have had to fire her was thus intentional

---

[17] "Lean" is a business improvement strategy that is designed to cut down on waste.  *See, e.g.*, Cathy Banks, *Demystifying the LEAN approach to business process improvement*, ANALYZE CONSULTING (Sept. 28, 2016), https://analyze.co.za/demystifying-lean-approach-business-process-improvement/.  It was widely used in the Department of Human Services and the OVA during this period.

discrimination.  *Id.* at 39-40 ("What was the basis for Mr. Yarn's decision to eliminate Ms. Ripoli's job?  Well, we know it wasn't based on Ms. Ripoli's qualifications . . . If he had asked, he would have learned that she had an excellent reputation for performance, character, and honesty.").

These arguments are speculative and at best present a weak argument for pretext.  As to her first argument, the record indicates that Mr. Yarn identified key areas of overlap between the two positions, and that he articulated these concerns in his email to senior leadership.  ECF No. 93-2 at 2-4 (Pl.'s Ex. 25).  It is not the Court's role to assess whether he made the right call, whether he correctly analyzed these positions, whether he did or didn't complete a proper "Lean" analysis, or whether he was wrong to lay her off.  *Keyes*, 853 F.2d at 1026 ("Errors in judgment are not the stuff of Title VII transgressions").  Suggesting that his analysis was not properly grounded in "Lean" principles, furthermore, is a far cry from proving that his stated reason for the reorganization was a lie.

As to the issue of Ms. Ripoli's qualifications, there are certainly cases in which a plaintiff has been able to rebut an employer's claims of misconduct or lack of qualification by showing that they were performing their job effectively.  *See, e.g.*, *Woodman*, 51 F.3d at 1092-93; *Reeves*, 530 U.S. at 144-45.  But critically, these cases have involved terminations where the *employee's performance was at issue.*  In *Woodman*, for instance, the plaintiff was fired after receiving a negative performance evaluation, which he was able to successfully rebut by pointing to ten years' worth of stellar reviews.  51 F.3d at 1092-93.  In *Reeves*, likewise, the plaintiff was terminated

based on timekeeping errors but was able to show he had kept accurate attendance records for employees under his supervision. 530 U.S. at 138. Ms. Ripoli was not laid off for misconduct or poor performance; she was laid off because the OVA was in the process of a reorganization and her role was determined to be redundant. Her qualifications for the position (and Mr. Yarn's knowledge of them or lack thereof) are thus irrelevant to the question of pretext.

Mr. Yarn had taken over management of the OVA, and he could have fired her for any reason at all, provided it was not discriminatory. To hold that Mr. Yarn *needed* a reason to fire her to escape a charge of discrimination would effectively force the Court to create a for-cause termination standard. We decline to do so here. We note furthermore that although we are not permitted to require a "smoking gun" as part of the pretext analysis (*see Thomas*, 183 F.3d at 64), both cases discussed above had one.[18] These cases stand for the principle that a plaintiff can get to the jury on pretext alone, provided they have clearly established both pretext and a prima facie case. Here, Ms. Ripoli's evidence on pretext boils down to the claim that she was more qualified than Mr. Yarn to make hiring and firing decisions. This is not enough to support an inference of discrimination.

---

[18] In *Woodman*, the First Circuit held that *in addition* to a successful rebuttal, the plaintiff had offered clear statements by a supervisor suggesting age-based animus ("These damn people—they want younger people here."). 51 F.3d at 1090, 1094. In *Reeves*, the plaintiff showed *in addition* to a successful rebuttal, a key decisionmaker had suggested that the plaintiff "was so old [he] must have come over on the Mayflower" and that he "was too damn old to do [his] job." 530 U.S. at 151-52. No similar evidence has been presented in this case.

There are two pieces of evidence in the record that support the notion that Mr. Yarn's purported reasons, as outlined in his email, were less than fully truthful. First, Ms. Ripoli is correct that Mr. Yarn omitted any reference to the creation of the Administrator for Strategic Communications, Policy & Legal Services, which was initiated shortly thereafter. ECF No. 81-4 at 27-28 (Def.'s Ex. W). A representative from Human Resources admitted that it was surprising that Mr. Yarn failed to include this. ECF No. 91 at 23-24 (Pl.'s Ex. 15). However, following Ms. Ripoli's layoff, Mr. Yarn was transparent about his reasoning for moving forward with revamped job descriptions. ECF No. 81-7 at 31 (Def.'s Ex. CCC); ECF No. 92-3 at 13-18 (Pl.'s Ex. 23). Furthermore, he appears to have gone through the proper channels to do so. That MJ's promotion was carried out with a Special Purpose Agreement does not suggest mendacity; this was a pathway available to Mr. Yarn, and he acted within his authority to make what he described as a long-overdue change. ECF No. 93 at 7-19 (Pl.'s Ex. 23). It would be speculative to suggest that he hid this out of a desire to conceal the truth.

The only other piece of evidence that suggests mendacity is an affidavit drafted by JR, a colleague of Ms. Ripoli's who was later transferred to another department, suggesting that before her layoff Mr. Yarn approached other members of the executive team without Ms. Ripoli's knowledge and asked them to provide written feedback regarding concerns about the OVA, and further asked them not to disclose the request. ECF No. 91-2 at 2-8 (Pl.'s Ex. 17). Mr. Yarn denies that this ever happened, but JR did provide Mr. Yarn with a list of concerns, which included no

28

specific details about Ms. Ripoli.  ECF No. 81-3 at 5-6 (Def.'s Ex. J).  This is a genuine dispute, but it is not material; Ms. Ripoli has not alleged that the list bore any connection to her layoff, and the feedback neither solicited nor included any information about her gender, disability, or sexual orientation.  Taken together, the evidence on pretext is speculative.

### iv.  Evidence of Discriminatory Intent

Even if we assume for the sake of argument that Ms. Ripoli has shown evidence of pretext, she has provided no evidence at all to support an inference of discriminatory intent.  This case involves over a thousand pages of exhibits, but Ms. Ripoli cites only two instances in total where anyone directly discussed or referenced a protected class.  The first occurred in 2013, when a subordinate (who was subsequently disciplined) referred to her as a "fucking dyke."  ECF No. 111 at 28.  The second occurred in 2015, when a colleague went out of his way to notify Ms. Ripoli's supervisor that she was a lesbian because he wanted her to be "aware of the situation."    ECF No. 96 at 9-10 (Pl.'s Ex. 11).    These episodes—while reprehensible in the first instance, and highly questionable in the second—are irrelevant to the current dispute as they predate the period in question and have nothing to do with Mr. Yarn, who effectuated her layoff.[19]

Ms. Ripoli need not provide a "smoking gun," but as it stands, she has provided no evidence at all as to how the layoff was connected to her gender, disability, or

---

[19] As noted above, Ms. Ripoli has indicated that the relevant period is February to July 2016 and that she is primarily concerned with discrimination by Mr. Yarn.

sexual orientation, other than these isolated comments, a single comparator (MJ), and the speculative evidence on pretext, as outlined above.[20]  We are not permitted to weigh the evidence, but we are also not permitted to send the case to a jury on speculation alone.  *See Theidon*, 948 F.3d at 496 ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").  There is no indication that Mr. Yarn ever asked about Ms. Ripoli's gender, disability, or sexual orientation, and no evidence at all that he treated her disrespectfully.  Nor does Ms. Ripoli put forward any admissible evidence to suggest that her gender, disability, or sexual orientation had anything to do with the layoff.  Even if Mr. Yarn had chosen MJ over Ms. Ripoli, simply preferring one employee to another is not enough to support an inference of discriminatory intent.  *See Carvalho*, 573 F. Supp. 3d at 641 (a tendency to favor and give attention to employees of one gender does not, without more evidence, amount to gender discrimination).  Ms. Ripoli has not provided evidence that the

---

[20] Ms. Ripoli further argues that the State engaged in "ad hoc" decision-making and that a "'failure to follow established procedures or criteria' is sufficient to support a reasonable inference of intentional discrimination."  ECF No. 94-1 at 42.  *See Olson v. Chao*, No. 3:17-cv-10970-KAR, 2019 U.S. Dist. LEXIS 167937, at *36 (D. Mass. Sep. 30, 2019) (citation omitted).  But even if this is true, she was hardly alone in being subject to ad hoc decisions.  At least two other people on the leadership team had been working out of job title at the time of her layoff.  ECF No. 108 at 26; ECF No. 108-1 at 41 (Def.'s Ex. GGG).  Correcting this problem was one of Mr. Yarn's stated reasons for updating their job descriptions, which he described as "long overdue."  ECF No. 81-7 at 31 (Def.'s Ex. CCC).

reorganization was a pretext to fire her because she is disabled, a woman, or a lesbian, and thus her Title VII claim fails.[21]

## IV.   CONCLUSION

After an exemplary career assisting veterans at the OVA, Ms. Ripoli is understandably upset at being let go when the Governor appointed a new director, and rightly questions if her termination resulted from discriminatory conduct. But after a full analysis of the record, and giving her all reasonable inferences mandated by law, the Court concludes that no reasonable jury could find by a preponderance of the evidence that her termination was motivated, in whole or in part, by any of her protected class designations. For the reasons outlined above, the Court GRANTS the State's Motion for Summary Judgment on all claims. ECF No. 79.

---

[21] As noted above, Rhode Island law follows Title VII for FEPA and RICRA claims, so these claims fail as well. *See, e.g., DeCamp*, 875 A.2d at 21. Ms. Ripoli's remaining claim is for unlawful discrimination under the CRPDA, which mirrors the Americans with Disabilities Act ("ADA"), not Title VII. *Rossi v. Amica Mut. Ins. Co.*, 446 F. Supp. 2d 62, 69 (D.R.I. 2005). In Rhode Island, courts generally apply the *McDonnell Douglas* framework, as outlined above. *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 98-102 (1st Cir. 2007) (holding that the district court did not err in granting summary judgment where the plaintiff failed to provide "any evidence which would enable a rational jury to find that the reassignment of her duties in June 2000 was based, either in whole or in part, on her alleged disability") (internal quotations omitted). As discussed, we find no admissible evidence linking Ms. Ripoli's layoff to her disability, so this claim fails as well.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

November 16, 2023